MICHAEL CRONIN and SHARON CRONIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SEYMOUR KOEHL and RUTH J. KOEHL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cronin v. Commissioner
Docket Nos. 28410-81, 358-82.
United States Tax Court
T.C. Memo 1985-83; 1985 Tax Ct. Memo LEXIS 551; 49 T.C.M. (CCH) 805; T.C.M. (RIA) 85083; February 25, 1985. *551 Ps claimed losses and investment tax credits arising from their investments in master recordings. Held: (1) None of the claimed losses is deductible because Ps' activities were not engaged in for profit within the meaning of sec. 183, I.R.C. 1954. (2) Because Ps did not acquire or have the master recordings distributed with the intention of making a profit, Ps are not entitled to investment tax credits under sec. 38, I.R.C. 1954. Edward W. Morris, for the petitioners. Alan H. Kaufman and Jody Tanser, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows: Docket No.
Petitioner
Taxable Year
Deficiency
28410-81
Michael Cronin
1977
$21,852.00
and Sharon Cronin
1978
7,969.00
358-82
Seymour Koehl and
1977
21,821.00
Ruth J. Koehl
1978
8,604.00
The issues for decision are: (1) Whether the petitioners, who acquired and had distributed for them certain master recordings, are entitled to deductions for losses and, if so, in what amounts; and (2) whether the petitioners are entitled to investment tax credits based on their investments in such master recordings. FINDINGS OF FACT Some of *552 the facts have been stipulated, and those facts are so found. When they filed their petitions in this case, the petitioners Michael and Sharon Cronin, husband and wife, maintained their legal residence in Roslyn, N.Y., and the petitioners Seymour and Ruth Koehl, husband and wife, maintained their legal residence in Kings Point, N.Y. Mrs. Cronin is the daughter of Mr. and Mrs. Koehl. Mr. and Mrs. Cronin and Mr. and Mrs. Koehl filed Federal income tax returns for the years at issue with the Internal Revenue Services. Mr. Cronin and Mr. Koehl will sometimes be referred to as the petitioners. The master recordings at issue in the present case were owned by, and were offered for sale to the petitioners by, the Rainbow Network Corporation (Rainbow). Tigertail Records (Tigertail) is a division of Rainbow. From its incorporation in 1976 through the fall of 1978, David Sacks was an 80-percent shareholder and Sheldon Sacks was a 20-percent shareholder in Rainbow. David and Sheldon Sacks also owned a second company, Children's Hour Music, Inc. (Children's Hour). The certificate of incorporation for Children's Hour was filed in New Jersey on September 14, 1977. From the incorporation of *553 Children's Hour until the fall of 1978, David Sacks was an 80-percent shareholder and Sheldon Sacks was a 20-percent shareholder. Until the fall of 1978, David Sacks was the president and Sheldon Sacks was the vice president and secretary of both Rainbow and Children's Hour.At the time the master recordings in the present case were offered for sale, David Sacks had about 5 years experience in marketing record albums. During 1978, David Sacks and Sheldon Sacks had a falling out. In the fall of 1978, David Sacks purchased Sheldon Sacks' stock in Rainbow and Children's Hour and thus became the sole shareholder of both companies. David Sacks will sometimes be referred to as Mr. Sacks. By agreement dated April 26, 1977, Rainbow engaged the services of Antart, Inc. (Antart), to promote the sale of 35 master recordings of record albums owned by Rainbow intended for children. At all relevant times, Stuart Spitz and Anthony Desimone were the principal officers of Antart; each owned 50 percent of the stock of Antart. The certificate of incorporation for Antart was filed in New York on February 7, 1977. Antart was a consulting firm, and it put together various investments. Mr. Sacks and *554 Mr. Spitz met in early 1977 through Mr. Sacks' accountant. Mr. Sacks wanted to exploit the master recordings owned by Rainbow by means of an investment package. In 1977, Antart was involved in two other sales of master recordings. Although the investors have seen some return on their investments, neither of these other sales has been profitable for the investors. Mr. Spitz formed Galactic Distributing Co., Inc. (Galactic), to distribute the record albums derived from the Rainbow master recordings in the retail market or the educational market. He was the sole shareholder and an officer of Galactic. The certificate of incorporation for Galactic was filed in New York on February 14, 1977. Galactic was dissolved by proclamation of the Secretary of State of New York, published March 25, 1981. Mr. Spitz was experienced in putting together investment packages. Neither Mr. Spitz, Mr. Desimone, nor Galactic had any experience in master recordings or in the music industry. The petitioners both attended college. Mr. Cronin is a college graduate, and Mr. Koehl attended college for one year. Both of the petitioners are executives of the Federal Sample Card Company, a manufacturer of sample *555 cards. Neither petitioner has any expertise in any facet of master recordings or in the music industry, and neither petitioner made any investment in master recordings or in the music industry prior or subsequent to his acquisition of the master recordings at issue. Neither has ever subscribed to any music industry publication. For the past 10 years, Seymour Pike has been the accountant for Mr. Cronin and Mr. Koehl, and Aaron Danzig has been their tax attorney. Although both petitioners have received tax advice from Mr. Pike and Mr. Danzig prior and subsequent to their investments in the master recordings, neither sought or obtained tax advice from Mr. Pike or Mr. Danzing with respect to his investment in the master recordings. Frederic Rosen, an attorney, was a business acquaintance of Mr. Spitz and Mr. Desimone. In 1979, Mr. Rosen acted as in-house legal counsel for Antart. Mr. Rosen was a longtime family friend of the petitioners, and he contacted them concerning the possibility of investing in master recordings. Mr. Rosen had limited experience in master recordings and in the music industry. He did have some clients who were performers or who were in the music industry. *556 Mr. Rosen has been a guest lecturer on tax shelters at the New York University School of Law tax department. On or about April 27, 1977, the petitioners met with Mr. Rosen, and he recommended that they invest in the master recordings at issue. He recommended the master recording investments because he felt that the master recordings were reasonably priced and that, with a good distributor, there was a chance to make some money.Mr. Rosen had read the investment memorandums for other master recording investments and was familiar with the usual "caveats" concerning the music industry and the "boiler plate" language contained in such investment memorandums. With respect to the investment memorandum for the master recordings in the present case, Mr. Rosen read the investment memorandum for the "economics of the deal"; however, he skimmed the "boiler plate" language in the memorandum. He obtained a "background and a sense of the costs" from Mr. Spitz and Mr. Desimone. Mr. Rosen characterized the master recordings listed in the investment memorandum in the present case as having a "generic" quality. He had seen children's records sold in various retail outlets for 99 cents or $1.99, and *557 he felt that a lot of children's records could be sold at that price. However, he did not suggest what the actual sales prices for the records derived from the master recordings at issue would be. At the time he discussed the possibility of investing in the master recordings with Mr. Cronin and Mr. Koehl, Mr. Rosen was not aware that records derived from the master recordings had been previously released. He advised the petitioners that there were certain tax benefits to be obtained from an investment in master recordings, although there were no guarantees that the Internal Revenue Service would not challenge the deductions and other tax benefits which might be claimed. At the April 1977 meeting with Mr. Rosen, the petitioners were provided with a brief summary of investment (the summary), an investment memorandum, and a package of signature documents. The first two paragraphs of the summary provide: Tigertail Records is making available a limited number of individual Children's Album Master Recordings * * * for purchase by individuals or corporations. The purchase of Master Recordings should be considered only by, and is suitable only for, those persons or corporations who can *558 afford to assume a high degree of risk and who can afford to sustain a total loss of their investment. Persons in lower and middle federal income tax brackets would not be able to utilize as fully as persons in higher income tax brackets certain income tax deductions which may be available to purchasers of Master Recordings. Prospective purchasers are warned in the summary that they should not construe the contents of the summary as legal, business, or tax advice and that each purchaser must demonstrate that he has the ability to evaluate the purchase of a master recording or that he has retained the services of representatives who have sufficient knowledge and expertise to evaluate the investment. The summary states that each purchaser will have the opportunity to engage professional services for the production and exploitation of the master recordings. The investment memorandum states that 10 of the master recordings are to be sold for $90,000 each, payment by means of a nonrecourse note for $74,000 and a $16,000 cash payment on the date of purchase or an $11,000 cash payment on the date of purchase and $5,000 payable on February 1, 1978. According to the investment memorandum, *559 the balance of the master recordings will be sold for $80,000 each; the cash payment portion is the same as for the $90,000 master recordings, but the nonrecourse note is to be only $64,000. If the purchaser of a master recording elected to pay only the $11,000 on the date of purchase, the remaining $5,000 would have to be evidenced by a promissory note bearing annual interest of 8 percent and be secured by an irrevocable letter of credit from a bank in form and substance acceptable to Tigertail. In large type, the investment memorandum states that this offering involves a high degree of risk, including risks as to the tax status of this transaction, potential conflicts of interest, and other risks. With respect to the possible tax consequences, the investment memorandum warns: THE TRANSACTIONS CONTEMPLATED IN THIS OFFERING HAVE TAX EFFECTS WHICH ARE NOT SUSCEPTIBLE TO ABSOLUTE PREDICTION. BECAUSE OF THE INTERNAL REVENUE SERVICE'S POLICY TO CLOSELY SCRUTINIZE TRANSACTIONS WHICH PROVIDE SIGNIFICANT TAX BENEFITS, THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT TAKE POSITIONS IN CONFLICT WITH THOSE TO BE TAKEN BY THE PURCHASER WHICH POSITIONS MIGHT ULTIMATELY BE *560 SUSTAINED BY THE COURTS. CERTAIN TAX ASPECTS OF THIS TRANSACTION ARE BASED ON ANALOGIES TO THE TAX PROVISIONS WITH RESPECT TO MOTION PICTURE INVESTMENTS PRIOR TO THE TAX REFORM ACT OF 1976. THE INTERNAL REVENUE SERVICE IS VIGOROUSLY LITIGATING CERTAIN OF THE PROVISIONS TAKEN WITH RESPECT TO MOTION PICTURES AND SHOULD THE INTERNAL REVENUE SERVICE PREVAIL IN SUCH LITIGATION, IT IS LIKELY THAT THE SAME PROVISIONS WILL BE APPLICABLE TO THE PURCHASE OF A MASTER RECORDING. * * * NEITHER TIGERTAIL, NOR ANY OFFICER, EMPLOYEE, ADVISOR OR REPRESENTATIVE OF TIGERTAIL OR ANY OTHER PERSON FURNISHING SERVICES TO OR ON BEHALF OF TIGERTAIL ASSUMES ANY RESPONSIBILITY FOR THE TAX CONSEQUENCES OF THIS TRANSACTION TO A PURCHASER. PROSPECTIVE PURCHASERS SHOULD BE AWARE THAT REGULATIONS OR INTERPRETATIONS OF THE INTERNAL REVENUE CODE BY CONGRESS, THE INTERNAL REVENUE SERVICE OR THE COURTS MAY REDUCE OR ELIMINATE ANTICIPATED TAX BENEFITS TO A PURCHASER. THE INTERNAL REVENUE SERVICE MAY DISALLOW PART OR ALL OF CERTAIN DEDUCTIONS ANTICIPATED TO BE CLAIMED BY THE PURCHASER, INCLUDING THE DEDUCTION OF THE INVESTMENT TAX CREDIT AND THE DEPRECIATION ALLOWANCES CONTEMPLATED THEREBY, IN WHICH EVENT THE INVESTORS *561 WOULD NOT RECEIVE THE ANTICIPATED TAX BENEFITS RESULTING FROM PURCHASE OF THE INTERESTS BEING OFFERED HEREBY. IN THE EVENT THAT THE NOTE WHICH REPRESENTS A PORTION OF THE PURCHASE PRICE IS FORECLOSED, SUBSTANTIAL ORDINARY INCOME, BUT NO CASH, MAY BE REALIZED WHICH WILL BE TAXABLE TO THE PURCHASER AT UNEARNED INCOME RATES. * * * * * * PROSPECTIVE PURCHASERS ARE NOT TO CONSTRUE THE CONTENTS OF THIS INVESTMENT MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM TIGERTAIL OR ANY OF ITS OFFICERS OR EMPLOYEES, AS INVESTMENT, LEGAL OR TAX ADVICE. EACH PROSPECTIVE PURCHASER SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND OTHER RELATED MATTERS CONCERNING HIS OR ITS INVESTMENT. The investment memorandum states that most of the record albums derived from the master recordings have not previously been released and that those that have been released have been marketed through mail order, primarily dependent on television advertising supplemented by catalogue mailings. However, in a later section, the investment memorandum states that all of the record albums derived from the master recordings have previously been in distribution, that some *562 of the record albums are currently being sold, but that no information on earlier sales of the record albums derived from the master recordings is currently available. The investment memorandum also states that in addition to the master recording, [1] a purchaser will obtain art work and packaging concepts and material which has been developed by Tigertail for use as album covers and as advertising material. With respect to distribution, the investment memorandum provides that each purchaser will have the opportunity, but will not be required, to engage the services of Galactic, which will arrange for the production and distribution of phonograph records and tapes and for other exploitation of the master recordings pursuant to a distribution agreement. The investment memorandum states that it is expected that Galactic will retain David Sacks, the president and controlling shareholder of Rainbow, or a corporation to be *563 formed by him, to render services in connection with distribution and administration. It further states that under the distribution agreement, Galactic will be paid a fee equal to 20 percent of the gross revenues derived from the distribution and exploitation and that such corporation will pay all of its expenses from such fee. The investment memorandum also points out that a principal shareholder of Galactic is Mr. Spitz, that Mr. Sacks or the corporation to be formed by him, if engaged, will be paid a fee for distribution consistent with the usual arrangements in the record industry, that a corporation in which Mr. Spitz is also a principal shareholder will be paid a fee of approximately $245,000 by Tigertail for its services in connection with this offering, and that Tigertail will pay the legal fees, sales commissions, and other expenses of this offering. If a purchaser entered into a distribution agreement with Galactic, the initial term of the agreement would be 3 years, but if the purchaser did not notify Galactic that he did not wish to renew the agreement not later than 90 days prior to the end of the 3-year period, the distribution agreement would be renewed for 3 additional *564 years successively. The distribution agreements entered into by the petitioners and Galactic provided that Galactic was to provide accounting statements to the petitioners with respect to their master recordings within 60 days of June 30 and December 31 each year during the term of the agreement. In the section entitled "Risk Factors," the investment memorandum states that a prospective purchaser should carefully consider the following risk factors prior to the purchase of a master recording: (1) Competition in the record industry and the inherent speculative nature of the industry; (2) the problems associated with distribution and promotion, including the fact that sales substantially greater than the industry average must be earned for the purchaser to recover his invesetment, the fact that historically a substantial portion of distribution revenues from recordings are realized during the first 2 years of the distribution of a record album, and the fact that such time has passed on most of the record albums produced from the master recordings; (3) foreclosure, whereby the purchaser might lose all rights and interests in the master recording if the income generated was insufficient *565 to pay the note in full and if the purchaser did not decide to pay off the note (the purchaser might also realize income measured by the difference between the unpaid debt and his then current basis in the master recording, and part of the depreciation taken on the master recordings would be "recaptured" and taxed to the purchaser as ordinary income upon the sale or disposition of the master recording by the purchaser); (4) possible personal liability to third parties, notwithstanding representations to the contrary by Tigertail; (5) restrictions on transfer as a result of possible application of the Securities Act of 1933 and various State securities laws; and (6) tax factors which are explained in detail in another section entitled "Income Tax Consequences." In the section entitled "Use of Proceeds," the investment memorandum explains the disposition of the expected aggregate proceeds of $2,900,000 to be received by Tigertail for the master recordings: Tigertail is to pay compensation of approximately $245,000 to Antart for the consultation services rendered and to be rendered by Antart relating to the offering. Approximately $56,000 is to be paid to various persons as sales commissions. *566 Approximately $25,000 is to be spent to defray legal expenses and approximately $11,000 is to be spent to defray other miscellaneous expenses incurred in connection with the offering. Thirty thousand dollars is to be used to pay a finder's fee to an individual who was responsible for formulating the arrangements with Antart, and the balance, if and when received by Tigertail, is to be used for general corporate purposes. In the section entitled "Conflicts of Interest," the investment memorandum states that if Mr. Sacks, or his corporation, is engaged in the distribution of the record albums derived from the master recordings, it is not contemplated that he will devote his time exclusively to the distribution and promotion of such record albums; he will continue to be employed by Rainbow and to produce, promote, and distribute recordings either for Rainbow or for others or for his own account. The investment memorandum also states that Galactic is currently contemplating obtaining the right to distribute or exploit other recordings and that Mr. Spitz, the sole shareholder of Galactic, may also for his own account, for that of Galactic, or for any other entity of which he is a principal, *567 acquire the right to produce, distribute, or exploit other recordings. The investment memorandum summarizes the exclusive rights to be acquired by a prospective purchaser as follows: [2] *568 (a) use, manufacture, promote, advertise, distribute, license, package, repackage, edit, change or vary the Master Recording in any and all fields of use and use or dispose of recordings derived from the Master Recording; (b) use the name, likeness and biography of each artist whose performance is embodied in the Master Recording in connection with the advertising, publicizing or sale of records manufactured therefore; and (c) release and permit others to release recordings derived from the Master Recording in any sound medium or device, now or hereafter known, under any name, trademark or label which the Purchaser and/or its licensees may, from time to time elect and to perform and to permit others to perform and to permit the public performance of the Master Recording by means of any broadcast medium. The investment memorandum provides that under the purchase agreement, the purchaser shall be required to make prepayments on the note by directing the distributor to make payments to Tigertail of 40 percent of the amounts payable by the distributor to the purchaser from the distribution and exploitation of the master recording under the terms of any distribution agreements entered into by the purchaser. Such prepayments shall be applied first against unpaid accrued interest and thereafter to reduce the principal balance of the note. The investment memorandum also provides that under the purchase agreement, the payment of the principal and interest under the note and the performance of the purchaser's obligations under the purchase agreement are to be secured by *569 a security interest in the master recording under the Uniform Commercial Code. The summary states that the sales price of each record album derived from a master recording will be $3.50 and that after all costs, including advertising and distribution, the investor will receive approximately 87 cents beginning with the first record album sold, 40 percent of which will be applied to the reduction of the note, and the remainder, 60 percent, will be paid in cash. In a section entitled "Suitability Standards," the investment memorandum reiterates that the master recordings offered are suitable only for an individual who demonstrates that he is capable of bearing the economic risk of the purchase and that he, through offeree representatives, if necessary, is capable of evaluating the merits and risks of such a purchase. The investnent memorandum further states that a master recording will be sold only to a purchaser who represents that he estimates that he will have during his current taxable year, taxable income, some portion of which will be subject to Federal income tax at the rate of 50 percent, after taking into account the deductions or income generated by the purchase of a master *570 recording. The investment memorandum also requires a purchaser to have substantial after-tax earnings and a net worth of at least $150,000. In a lengthy section entitled "Income Tax Consequences," the investment memorandum discusses certain aspects of the proposed transaction which might be challenged by the IRS and might adversely affect the income tax consequences of the transaction, including: inclusion of nonrecourse indebtedness in the purchaser's basis; the useful life and salvage value utilized by the purchaser in computing depreciation; treatment of the transaction as a joint venture, a financing arrangement, a license arrangement, or a "net lease"; treatment of Galactice and the seller as affiliated partners; application of the "at risk" rules under section 465 of the Internal Revenue Code of 1954[3]; the useful life utilized for purposes of the investment tax credit; the cost of the master recording for investment tax credit purposes; predominant use of the master recording outside the United States; constructive foreclosure on the note if prior to maturity there appears to be no possibility of further economic exploitation of the master recording; limitation on deduction *571 of interest under section 163(d); and applicability of section 183, "activities not engaged in for profit." [4] Attached to the investment memorandum was a tax opinion of counsel from the law firm of Pryor, Cashman, Sherman & Flynn, New York, N.Y. The tax opinion discusses: joint venture status; purchaser's basis; depreciation; recapture consequences; investment tax credit; maximum tax on items of tax preference; maximum rate on personal service income; capital gains; State, local, and foreign taxes; possible application of section 183; investment interest expense; sale or other disposition of the master recording; and atrisk limitation. The summary contained two tables setting forth the proposed tax consequences of an investment in a master recording. One table provided as follows: Total Purchase Price:
$90,000
Cash Down Payment:
16,000
* *572 Less 1977 Investment Tax Credit:
6,000
Net Cash:
10,000
Note:
75,000
Ten year Non-Recourse
Actual Cash
Year
Investment
Depreciation (%)
Total
1977
$10,000
$45,000 (50%)
$45,000
1978
27,000 (30%)
27,000
1979
9,000 (10%)
9,000
1980
4,500 (5%) 4,500
1981
4,500 (5%) 4,500
$10,000
$90,000
Computation subject to investment made prior to April 15, 1977 and that there will be no income generated from the sale of the record album. Investor must substantiate that he is at least in the 50% tax bracket. The other table was substantially the same except that it showed depreciation of $36,000 for 1977 and total depreciation of $81,000. Neither the summary nor the investment memorandum describes in any specific manner any of the individual master recordings, other than to list the 35 titles; neither contains any projections of expected revenues or profits to be derived from the master recordings. On April 28, 1977, each of the petitioners signed a subscription agreement, a purchase agreement, a 6-percent nonrecourse promissory note in favor of Rainbow in the principal amount of $75,000 due April 1, 1987, a security agreement, and an exclusive distribution agreement with Galactic. Each petitioner paid Antart, as agent for Tigertail, $15,000 by check, and each filled *573 out and signed a prospective offeree questionnaire. Mr. Cronin and Mr. Koehl each paid $15,000, rather than $16,000, in cash for their master recordings because Mr. Rosen arranged with Antart that he would not be paid a sales commission for the master recordings purchased by Mr. Cronin and Mr. Koehl. Mr. Cronin purchased a master recording entitled "Peter Pan," and Mr. Koehl purchased a master recording entitled "The Sorcerer's Apprentice." "Peter Pan," a musical show starring Sandy Duncan, opened in New York City at the Lunt-Fontanne Theater on August 10, 1979. In the subscription agreement, each petitioner warranted that he had net worth (exclusive of home, furnishings, and automobiles) of at least $150,000, and he expected that, after taking into account his share of the anticipated losses incurred in connection with the ownership of the master recording, at least some portion of his current gross income would be subject to Federal income tax at the rate of at least 50 percent. Each petitioner also warranted that he had read and was familiar with the investment memorandum and that he had consulted with his professional, tax, and legal advisors with respect to the Federal and *574 State or local income tax consequences of the purchase of the master recording. Each warranted that he understood that the master recording involved an extremely high degree of risk and that no prediction could be made as to profits, if any, to be derived from the exploitation of the master recording. Prior to investing in the master recordings, neither petitioner was provided with an appraisal of "Peter Pan" or "The Sorcerer's Apprentice." In addition, neither obtained his own appraisal. Neither Mr. Cronin nor Mr. Koehl knew how many record albums were required to be sold, or at what price, in order to pay off his nonrecourse note.Mr. Koehl did not know how many record albums were required to be sold, or at what price, before he would make a profit from his investment in the master recording. Neither Mr. Cronin nor Mr. Koehl was ever provided with any sales or income projections for his master recording. At the time they purchased their master recordings, Mr. Cronin and Mr. Koehl were unaware that Galactic had no experience in the record business. Neither Mr. Cronin nor Mr. Koehl notified Galactic that he did not wish to renew the distribution agreement between himself and Galactic *575 for another 3 years, after the expiration of the first 3 years. Neither Mr. Cronin nor Mr. Koehl was sure that he would have purchased a master recording if he had had to pay $90,000 in cash for it. Mr. Cronin and Mr. Koehl received copies of the record albums derived from their master recordings approximately 3 months after they had purchased the master recordings. It was at that time that they first listened to the record albums derived from their master recordings. Neither petitioner has ever had possession of his master recording. The petitioners relied solely on the advice and recommendation of Mr. Rosen in deciding to invest in the master recordings. In a document dated June 10, 1977, Tigertail amended relevant portions of the investment memorandum and other documents in substance as follows: (1) The name "Tiger Tail" or "Tigertail" could not be assigned to the purchaser; therefore, all statements in the investment memorandum or other documents indicating that a purchaser would acquire the right to use such names were deleted. (2) Since all of the master recordings had been released prior to 1972, there was no copyright protection available to the master recordings under the *576 copyright laws of the United States; accordingly, all representations to the contrary were deleted. (3) All of the record albums had previously been released, and prior release had been through retail outlets and mail order. Each petitioner confirmed in writing his subscription to purchase his master recording after having reviewed the amendments. Neither petitioner received any consideration for agreeing to the amendments. Rainbow had purchased 36 master recordings, which included "Peter Pan" and "The Sorcerer's Apprentice," from Audiofidelity Enterprises, Inc. (Audiofidelity), for $25,000 in May 1976. In purchasing the master recording, Rainbow also obtained the physical inventory (records, sleeves, jackets, and printed material) and the trademark "Tiger Tail," which had been used by Audiofidelity under a license from Exxon Corporation. Audiofidelity had purchased the master recordings in 1971 from the Abbey Record Corporation (Abbey). Prior to the acquisition of the master recordings by Rainbow, records derived from the master recordings were sold and distributed by Abbey under the Panda label and by Audiofidelity under the Tigertail label. Galactic never entered into a formal *577 agreement whereby the record albums derived from the master recordings would continuously be distributed. Under a proposed agreement, Galactic was to grant an exclusive license to distribute the record albums derived from the master recordings to Children's Hour. Galactic spent between $25,000 to $50,000 on the distribution of all of the Tigertail records. Children's Hour did, to a small extent, advertise the Tigertail record albums on television, and it did sell some records, but not very many. Children's Hour also sent sales kits concerning the Tigertail record albums to 30,000 teachers and librarians throughout the United States. During 1978, Children's Hour also delivered Tigertail record albums to 9 Bloomingdale's stores. However, the stores sold only a total of approximately 610 record albums. In 1978, relations between Children's Hour and Galactic began to deteriorate. Galactic thought that Children's Hour was not remitting funds due to Galactic as a result of sales by Children's Hour of Tigertail record albums; Children's Hour thought that Galactic was supposed to assist Children's Hour with the cost of maintaining the necessary inventory of record albums, but was not *578 doing so. In March 1979, Children's Hour notified Galactic that it was terminating any relationship it had with Galactic. Children's Hour also proposed to sell the inventory of Tigertail record albums either to Galactic or directly to the investors.Galactic refused to purchase the inventory of Tigertail record albums from Children's Hour, and thereafter, Children's Hour offered the inventory of each master recording directly to the investors. In 1979, Galactic filed suit against Children's Hour alleging in part that during 1977, Children's Hour sold a number of record albums but failed and refused to render timely and complete accountings of sales and amounts due Galactic and failed and refused to pay Galactic the amounts due it. In an affidavit dated June 20, 1980, Mr. Sacks, as president of Children's Hour, opposed Galactic's motion for an order enjoining Children's Hour from disposing of the record albums derived from the master recordings. In his affidavit, Mr. Sacks stated: "The underlying transaction between the parties involves a classic tax shelter situation." Mr. Sacks also stated: 7. In fact, and in breach of its obligations under the distribution agreement, plaintiff *579 evidenced no intention of manufacturing records from the master recordings, never manufactured any records from the master recordings, sold only one record on behalf of the investors (supplied by Rainbow) and never expended any funds in order to promote or advertise these records. In short, there was no effort made by plaintiff and its principals, as the promoters of the tax shelter, to realize any economic benefit on behalf of the investors or to repay any portion of the promissory note due to Rainbow. The investors received a tax deduction in the year of their investment far in excess of their cash contribution thus "sheltering" income equal to the difference between the deduction and the investment. It is this feature that was marketed by plaintiff with no concern given to any ultimate economic return to the investors (or to Rainbow) and it is for this reason that plaintiff made absolutely no efforts to produce, advertise or market a product from the masters for the benefit of the investors. Galactic's suit against Children's Hour was eventually settled. In an agreement dated April 29, 1981, between Galactic and Rainbow/Children's Hour, Galactic agreed to pay Rainbow/Children's *580 Hour certain amounts, to no longer pursue its suit against Rainbow/Children's Hour, and to take over distribution of the Tigertail record albums. Rainbow/Children's Hour agreed to assist Galactic in distribution. In addition, Galactic agreed to share, after the payment of certain costs, its net revenues with Rainbow/Children's Hour. The proceeds received by Rainbow/Children's Hour were to be considered principal payments by the owners of the 42 master recordings involved on their nonrecourse promissory notes, and Rainbow/Children's Hour agreed to waive all future interest payments on the nonrecourse promissory notes. Galactic did enter into a written distribution agreement with Premium Ventures Corp. (Premium Ventures) to distribute certain record albums during the 1978 Christmas season. This distribution effort emphasized the record albums that had a Christmas theme. "Peter Pan" was included in the record albums offered by Premium Ventures. The record in this case does not establish whether or not record albums derived from "The Sorcerer's Apprentice" master recording were included in the Premium Ventures distribution effort. Galactic lost money on this distribution effort. After *581 the April 1981 agreement, relations between Rainbow/Children's Hour and Galactic continued to be poor.At one point, Galactic failed to pay Rainbow/Children's Hour $5,000 that it had agreed to pay in the April 1981 agreement. At the time of trial, Galactic had been unsuccessfully negotiating for 2-1/2 years with Audiofidelity to have Audiofidelity distribute the record albums derived from the master recordings. The breakdown in relations between Children's Hour and Galactic adversely affected the petitioners' ability to obtain information concerning the distribution of the record albums derived from their master recordings. During 1979, in various letters, Galactic explained to the petitioners the difficulties that it was experiencing with distribution. Galactic stated that it had received from Children's Hour a statement of account for sales of record albums only for the period January 1, 1978 to June 30, 1978, but that the required payment from Children's Hour was not made. Galactic further stated that no statement of account was received by it for either the period ending December 31, 1977, or the period from July 1, 1978 to December 31, 1978. Galactic therefore did not furnish *582 statements of account or make payment of a share of receipts to the petitioners for either 1977 or 1978. Galactic did advise the petitioners that they, as cash method taxpayers, would have no reportable earnings for 1978. Galactic also suggested that the petitioners utilize a 7-year useful life for depreciation purposes and that they utilize the straight-line method of depreciation. In a 1980 letter, Galactic informed the petitioners that the lawsuit was still pending against Children's Hour and that Galactic was still unable to supply the petitioners with information regarding the distribution of Tigertail record albums. The letter also informed the petitioners that they had no reportable earnings in 1979. The letter suggested that the petitioners speak to their accountant with respect to the possible effect of the 1978 tax laws on their investment. During 1980, in letters to the petitioners, Galactic advised them not to accept any offer made by Rainbow/Children's Hour to sell the Tigertail inventory directly to the investors. In a 1981 letter, Galactic advised the petitioners that they had no income to report for 1980 from their investment in the master recordings. The letter *583 also advised the petitioners to continue to use a method and basis of depreciation consistent with what was used in the past. In letters dated May 4, 1981, Galactic informed the petitioners of the settlement of the lawsuit against Rainbow/Children's Hour. Galactic also informed Mr. Cronin that a recent sale from inventory generated enough cash to make a principal payment of $475.19 on his nonrecourse note. In its letter to Mr. Koehl, Galactic stated that the same amount had similarly been generated and had also been used for a principal payment on his note.Galactic also informed the petitioners that Rainbow/Children's Hour had agreed to waive future interest payments and that its share of future distribution proceeds would be considered debt principal repayments. The May 4, 1981 letters also discussed tax matters. They stated that Rainbow/Children's Hour had made available to Galactic "all the historical sales data and sales efforts made on your behalf" and that this information would help the petitioners "in any discussions your accountant might have with the IRS regarding the profit motive incentive or the value of your record album(s)." With respect to the repayments made on *584 the petitioners' nonrecourse notes, the letters state: "This should also assist your accountant vis-a-vis the IRS because your nonrecourse promissory notes are being, and will be, reduced and eventually paid off." Prior to the day of trial, Mr. Cronin and Mr. Koehl had never met Mr. Spitz. The Commissioner subpoenaed Mr. Spitz, as president of Galactic, and requested all records or documents showing any expenditures made by Galactic with respect to the distribution of the record albums derived from the master recordings. No such records or documents were provided at any time. On their 1977 and 1978 income tax returns, each petitioner reported his master recording activities on a Schedule C; each reported that he acquired his master recording in April 1977, and each claimed a depreciable basis of $90,000. On their 1977 and 1978 returns, each petitioner used the double-declining balance method to calculate his depreciation deductions. Each petitioner also claimed on investment tax credit on his 1977 return with respect to his investment in a master recording. On his 1977 return, Mr. Cronin also claimed production costs of $39. On their 1977 returns, Mr. Cronin reported income of *585 $195 from his master recording activity, and Mr. Koehl reported income of $172 from his master recording activity. The record is unclear how each of the petitioners determined the amount of income which he reported in 1977. Neither petitioner reported any income from his master recording activity on his returns for the years 1978 through 1981. The Commissioner disallowed all losses claimed by the petitioners. He also disallowed the petitioners' claimed investment tax credits. OPINION The issues to be decided in this case are the extent to which the petitioners are entitled to deduct losses arising out of their investments in the master recordings and whether the petitioners may claim investment tax credits with respect to the master recordings purchased by them. The Commissioner's primary position, and the one we shall address first, is that the petitioners did not purchase or have the master recordings distributed for them with the intention of making a profit. Accordingly, he argues, the petitioners are entitled to no investment tax credits and may deduct their claimed expenses only to the extent allowable under section 183. Section 183(a) provides that if an individual does *586 not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions only to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1). It is well settled that in order to constitute the carrying on of a trade or business under section 162(a), [5] the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; see also Hager v. Commissioner,76 T.C. 759, 784 (1981), *587 and the cases cited therein. However, the expectation of profit need not be a reasonable one; it is sufficient if there is a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. by order (2d Cir. Jan. 23, 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984); Hager v. Commissioner,supra.The issue of whether there is the requisite intention to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case ( sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980)), and the burden of proving the intention is on the petitioners (Rule 142(a), Tax Court Rules of Practice and Procedure[6] ; Golanty v. Commissioner,supra at 426). Greater weight is to be given to objective facts *588 rather than to the parties' mere statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,supra at 1007. Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of some relevant factors to be considered in determining whether an activity is engaged in for profit. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Each of the petitioners testified at trial. At trial and on brief, they steadfastly *589 maintain that their master recording activities were engaged in for profit. The petitioners concede their lack of experience in this type of venture. However, they argue that they relied on Mr. Rosen to evaluate the master recording investments for them and that they relied on Galactic, as the distributor, to arrange for distribution of the record albums derived for their master recordings. The petitioners argue that the difficulties that arose between the distributor, Galactic, and the subdistributor, Children's Hour, were not their fault, and they contend that they made every effort to follow the progress of the distribution of the records. Under circumstances different from those in the present case, we might be inclined to afford some weight to the petitioners' arguments. However, in the present case, it is overwhelmingly clear from the record before us that, as Mr. Sacks stated in his affidavit opposing Galactic's motion for a protective order against Children's Hour, "The underlying transaction between the parties involves a classic tax shelter situation." The petitioners, we believe, were primarily interested in the hoped-for favorable tax consequences of their purchase *590 of the master recordings. Neither of the petitioners' master recording activities was an activity engaged in for profit. The circumstances surrounding the petitioners' purchase of their master recordings clearly indicate that the master recordings were not an activity engaged in by the petitioners for profit. First, the summary of the investment memorandum, as well as the investment memorandum itself, emphasized to a significant extent the anticipated tax benefits of an investment in master recordings.A tax avoidance purpose is not inconsistent with the desire to earn profits. McLane v. Commissioner,46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967); Knetsch v. United States,172 Ct. Cl. 378, 348 F.2d 932 (1965). However, where an activity is engaged in solely to reduce Federal income taxes, the activity is not considered to be engaged in for profit. Hager v. Commissioner,76 T.C. at 785; DeWoskin v. Commissioner,35 T.C. 356, 364 (1960). In the summary and the investment memorandum, there is no discussion of the amount or the likelihood of profits which an investor might expect. Beyond a listing of the titles of the master recordings, there is no description *591 or discussion of any particular master recording. The petitioners were never provided with an accurate sales history of the record albums derived from their master recordings. Moreover, at the time of trial, Galactic was still unsuccessfully attempting to reconstruct the sales history of the record albums derived from the master recordings. The investment memorandum's discussion of how the master recordings were to be commercially exploited is also woefully inadequate for any investor seriously interested in economic profits. The investment memorandum does not even disclose how distribution is to be handled; it merely states that Galactic, which had no experience in master recording distribution, anticipates entering into a subdistribution agreement with a company to be formed by Mr. Sacks. The most critical aspect of the whole deal, distribution, had not been in any respect finalized at the time the petitioners purchased their master recordings. Second, it is clear that the petitioners purchased their master recordings at highly inflated prices. See Flowers v. Commissioner,80 T.C. 914, 937 (1983); Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th cir. *592 1984). Each of the petitioners paid $90,000 for his master recording, $15,000 in cash and $75,000 by means of a nonrecourse note. The Commissioner introduced expert reports, as well as testimony, from two expert witnesses concerning the fair market value of the master recordings in the present case. The petitioners offered no expert testimony concerning the value of the master recordings. One of the Commissioner's expert witnesses, Gary Krisel, was at the time of trial the president of Walt Disney Music Company. Walt Disney Music Company is a wholly owned subsidiary of Walt disney Productions and includes Disneyland-Vista Records, the largest children's record company in the world. Mr. Krisel evaluated and appraised the fair market value in 1977 of both "Peter Pan" and "The Sorcerer's Apprentice." In part, his expert report states: Both masters are typical of low budget, minimum quality masters produced from the late fifties to the early seventies. As with any number of similar recordings, their only consumer appeal was familiar public domain material and a very low retail price. With this type of product packaging is often of greater concern than the quality and content of the *593 recording, since the consumer cannot preview the recording before making his purchase. * * * The Peter Pan master tells the well known children's story of J. M. Barrie's Peter Pan. The story is told with narration and dialogue. The script is uninspired; the actors at times amateurish; the background music sparse; and the sound effects almost nonexistent. Unlike high quality recordings of Peter Pan successfully on sale in 1977, it lacks pacing, exciting music cues, realistic sound effects, clever scripting and the dramatic characterizations of carefully selected actors. Nevertheless, this master does equal the bare minimum standards of budget priced recording available in 1977. The master is at a serious disadvantage to competitive peter Pan recordings because it includes none of the music and songs from the two most popular versions of Peter Pan--the Mary Martin Broadway show or the Walt Disney motion picture. The Broadway show included songs like, "I Won't Grow up," and "Neverland." The Disney version included "You Can Fly," "Following the Leader," and "Second Star To The Right." These two versions have become synonymous with the public's concept of the story of Peter Pan. The *594 songs would be sorely missed by consumers deciding which version of Peter Pan to buy. Contrary to what some minor record companies believe, Peter Pan is held to be a copyrighted work by the owners of the copyright, Hospital for Sick Children in London. Their position was upheld as recently as 1980 in Hospital for Sick Children v. Melody Fare Dinner Theatre, 209 USPQ 749 (Eastern District for Virginia, 1980). A recording such as this may lack the insignificance to attract the copyright owner's attention. However, the right to produce a recording such as this could certainly be challenged and would be expensive to defend. While the copyright of the story of Peter Pan may be challenged in the United States, it is clearly protected in the other major countries. * * * * * * The Sorcerer's Apprentice master includes the story "The Sorcerer's Apprentice" on Side I and eight unrelated children's traditional songs on Side II. The Sorcerer's Apprentice tells the second century legendary story, retold in Gothe's [sic] 18th century poem, "Apprentice To Magic" made somewhat more popular by Mickey Mouse in the motion picture, "Fantasia." The story is told with a single narrator and background *595 music cues which sound like needle drops from an old version of Paul Dukas's "Sorcerer's Apprentice." All in all Side I is an adequate, if somewhat dated sounding recording. Paul Dukas's music is in the public domain in the United States. However, outside of the United States mechanical royalties would be required by the copyright owners. The packaging advertises that James Dukas narrates with the Panda Symphony Orchestra. Since neither are household names, they add no value to the product. Side II is a collection of eight public domain songs performed by Candy Anderson and Steve Clayton who are completely unknowns. All of the songs are performed in an old fashioned, uninspired manner with minimal production values. The arrangements do nothing to enhance the songs. Two of the songs, "I've Been Working On the Railroad," and "Big Rock Candy Mountain" were among the more common and popular selections of children's public domain material in 1977. "Little Liza Jane" enjoyed more popularity in years gone by. "Captain Jinks" and "Where Did You Get That Hat" have little name appeal. "Go Tell It On the Mountain" and "Aura Lee" are too slow and not particularly entertaining for children *596 of very low age group for whom this record would be purchased. While the recording is not particularly entertaining, and the songs are included primarily to fill up the space left vacant by the short story of Sorcerer's Apprentice, this recording does equal the minimum standards of lowpriced, budget children's recordings available in 1977. Mr. Krisel's report is also critical of the packaging of the records derived from the master recordings. Particularly, he considered the juvenile jigsaw puzzle on the outside back of the album jackets, the "only unique feature of this product," to be a "serious negative to the product's success in the retail trade, direct mail market or school market." Mr. Krisel's report explains that in the 1977 retail trade virtually all records were sold on a sale or return basis and that the jigsaw puzzle presented the possibility of lost puzzle pieces which would require that the entire jacket be replaced if a single puzzle piece were lost. Mr. Krisel concludes that the jigsaw puzzle would force the product to be priced too high to be competitive in the retail trade and would preclude financial success for the marketing of the master recording record albums. *597 In determining the fair market value of the master recordings in the present case, Mr. Krisel considered the cost of recording comparable record albums and producing the artwork which he estimated would range from $5,000 for a non-union production to $15,000 for a union production. He also considered similar master recordings which were readily available in 1977 and which he estimated could be purchased for amounts ranging from $500 to $3,500. For the foregoing reason, Mr. Krisel valued the master recordings at issue in 1977 at approximately $1,000 each. Mr. Krisel's expert export also analyzes the purchase agreement and ancillary documents used in the present case. The report points out that the children's record industry is highly competitive, but that if the master recordings at issue had been marketed by an established manufacturer/distributor of children's records as a line of product with more conventional jackets under typical industry sales terms, the master recordings could have sold as many as 15,000 units per title through retail distribution channels. However, the report warns, without a strong manufacturer/distributor, the master recordings could not be expected to *598 achieve profitable retail sales. With respect to the possibility of marketing albums derived from the master recordings at issue through direct marketing or to schools and libraries, Mr. Krisel's report states that neither was a likely possibility. After Mr. Krisel had prepared his appraisal of the fair market value of the master recordings, he was supplied with the actual purchase price of the master recordings. At one point in his discussion of the economic feasibility of the master recording investments at issue, he states: "It is obvious that there was no hope of recovering the initial investment or repaying the non-recourse note. The while transaction was worthless." In describing the distribution arrangement with Galactic, Mr. Krisel writes: "From the investor's point of view, the Galactic deal should appear outrageous. However, when one considers that the masters are virtually worthless, one understands that the galactic Distributing Company, Inc. arrangement was probably appropriate." The Commissioner's other expert witness, John Wiedenmann, has over 20 years experience in the music industry and, at the time of trial, headed his own consulting firm which served all phases *599 of the music industry. He considered the master recordings to be "quality" productions. But, he, like Mr. Krisel, considered the jigsaw puzzle to be a negative factor. Mr. Wiedenmann concluded in his report: It is my professional opinion, that based on that purchase price, The Rainbow Network; exercising due diligence and possessing the necessary expertise; could have successfully marketed and distributed the catalog of master recordings and could have generated a profit from their investment. However, in 1977, these masters were sold to an individual at a price that completely eliminated any profit potential that had previously existed. At a purchase price of $90,000.00 (ninety thousand dollars), no person could anticipate a return on that investment. An owner of one or two masters would have serious problems in attempting to market the product. It would be next to impossible to set up any other kind of distribution except for what was actually done. This was not a sound business arrangement. There is no indication that the distributor, Galactic Distributing Co. Inc. possessed any professional knowledge of the children's master recording marketplace. It is further indicated *600 that the sub-distribution agreement between Galactic and Children's Hour was never signed. An analysis of that agreement reveals it to be a poor business arrangement and had it been signed it would have been next to impossible for the sub-distributor to abide by the terms. Unless the terms were amended there would be little incentive for any sub-distributor to attempt to market the master recordings involved. Mr. Wiedenmann's report was more optimistic than Mr. Krisel's. He estimated that, assuming a very professional distribution effort, the maximum sales potential under ideal conditions would be 50,000 units for each master recording. In order to achieve this level of sales, Mr. Wiedenmann estimated that the price structure would not permit a net profit of more than 20 cents per unit. He concluded that under optimum conditions, a $10,000 profit could be derived from each of the master recordings at issue. However, according to Mr. Wiedenmann's report, the purchase price in 1977 for the master recordings at issue should not have exceeded $2,000. Mr. Wiedenmann explained at trial that such a price would result in a net profit of $8,000 per master recording under optimum conditions. *601 Both of the Commissioner's experts testified that there were a number of master recordings available which were the equivalent of those purchased by the petitioners. Both experts also testified that the distribution agreement entered into between the petitioners and Galactic was unusual and unlike any distribution agreement which would be entered into to market a record album, and both experts testified that nonrecourse financing was never used in the music industry to purchase master recordings. Prior sales may also be indicative of an inflated purchase price. Brannen v. Commissioner,78 T.C. at 497; Narver v. Commissioner,75 T.C. 53, 96-97 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). In the present case, Rainbow acquired 36 master recordings from Audiofidelity in 1976 for a total cost of $25,000. In 1977, Rainbow, through Antart, sold the same master recordings for $90,000 or $80,000 each. The recent Audiofidelity-Rainbow sale is additional persuasive evidence that the price at which Rainbow sold the master recordings to the petitioners was grossly inflated. The petitioners have presented no expert testimony with respect to the value of the master recordings. Furthermore, *602 no expert, independent valuation was obtained by either petitioner prior to or after his acquisition of a master recording. See Flowers v. Commissioner,80 T.C. at 933; Brannen v. Commissioner,supra at 508. The petitioners relied solely upon Mr. Rosen to evaluate the master recordings investments, and they relied solely upon Galactic to arrange for distribution of the record albums derived from the master recordings. We are convinced that the purchase price for the master recordings was determined without a true regard for the potential profitability of the master recordings. Both petitioners testified that they sincerely intended their master recording investments to be profitable. However, neither of the petitioners was willing to testify that he would have paid $90,000 in cash for his master recording. According to the expert witnesses who testified, under the most favorable circumstances, the petitioners would not have been able to pay off the nonrecourse note given to Rainbow after paying for the costs of distribution required to achieve the maximum sales potential for the record albums derived from the master recordings. The petitioners' lack of genuine concern over the nonrecourse *603 portion of the purchase price is further evidenced by the fact that although Mr. Rosen agreed to waive his commission for the sale of the master recordings to the petitioners, the total purchase price remained the same; the cash portion was reduced, but the nonrecourse portion was increased by a like amount. An examination of the relevant factors contained in section 1.183-2(b) of the regulations also indicates that the petitioners' master recording activities were not engaged in for profit. The petitioners testified that they made repeated efforts by means of telephone calls to find out how the distribution of records derived from their master recordings was progressing but that they were only able to learn that there was an ongoing disagreement between the distributor, Galactic, and the subdistributor, Rainbow/Children's Hour. However, despite their inability to obtain information concerning their investments, neither petitioner took any legal action against any of those involved in the distribution of the record albums.[7] See Flowers v. Commissioner,80 T.C. at 940-941. In addition, neither petitioner took advantage of the opportunity, after the first 3 years of the existence *604 of the distribution agreement, to terminate the distribution agreement with Galactic by so notifying Galactic prior to the automatic renewal of the distribution agreement. On the whole, on the record before us, we find the petitioners' efforts to monitor their investments were minimal at best. See Flowers v. Commissioner,supra at 938-940. A second factor relevant to our section 183 inquiry is the expertise of the taxpayer or his advisors. See sec. 1.183-2(b)(2), Income Tax Regs.; Fox v. Commissioner,80 T.C. at 1009-1012; Brannen v. Commissioner,78 T.C. at 511. In the present case, the petitioners themselves had no expertise in master recordings or in any facet of the music industry. The petitioners' advisors were only slightly more experienced. Mr. Rosen's expertise was as a financial advisor; his experience in master recordings and the music industry was minimal. Mr. Spitz, the sole shareholder and an officer of Galactic, the distributor, was also primarily a financial advisor; he had little experience in *605 master recordings and the music industry. Finally, Mr. Sacks had some experience in master recordings and the distribution of record albums. He did make some effort to distribute the record albums derived from the petitioners' master recordings.However, once again, his efforts, like the others involved in the present case, were on the whole minimal at best. The fact that Galactic and Rainbow/Children's Hour never entered into a formal distribution agreement certainly prevented any possibility of a successful distribution of the record albums. Moreover, as both of the Commissioner's expert witnesses testified, the distribution agreement that Galactic and Rainbow/Children's Hour were supposed to enter into lacked the necessary economic motivation for Rainbow/Children's Hour to initiate any serious distribution effort. Two more factors listed in the section 183 regulations that are significant in the present case [8] are the fact that the two other master recording investments organized by Antart were never profitable and the record of losses of the master recordings in the present case. Both petitioners reported large losses during the years at issue. Neither of the petitioners' master *606 recording investments ever showed a profit. The petitioners each reported a small amount of income in 1977, but neither of the petitioners reported any income from his master recording activity on his returns for the years 1978 through 1981. On the whole, the petitioners were indifferent to any economic profit to be derived from their master recording activities. Mr. Koehl did not listen to his master recording before he purchased it. He testified that he did remember "The Sorcerer's Apprentice" from the Walt Disney movie "Fantasia." The version of "The *607 Sorcerer's Apprentice" in "Fantasia" consists of music conducted by Leopold Stokowski and is unlike Mr. Koehl's master recording which has a narrator telling the story of "The Sorcerer's Apprentice." Mr. Koehl also testified that he investigated how large was the market for children's record albums by asking salespersons in department stores how well children's records were selling. Mr. Cronin testified that he was excited in April 1977 when he purchased his "Peter Pan" master recording, in part because "Peter Pan" was being revived on Broadway. However, the Broadway revival of "Peter Pan" did not open until August 10, 1979. Based on the entire record, we conclude that the petitioners have failed to sustain their burden of proving that they engaged in their master recording activities for profit. Since the petitioners' activities are not ones for which deductions are allowable under section 162, the activities are "not engaged in for profit" as defined in section 183(c). Accordingly, the petitioners' deductions attributable to such activities are subject to the limits of that section. The Commissioner has also disallowed the petitioners' claimed investment tax credits for their *608 master recordings on the ground, among others, that the petitioners' master recording activities were not activities engaged in for profit. Section 48(a), as in effect during 1977, limits the availability of the investment tax credit under section 38 to "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life * * * of 3 years or more." Depreciation deductions are allowable only with respect to property which is used in a trade or business or held for the production of income. Sec. 167(a). As we have already discussed, the presence of a profit motive is essential to the existence of a trade or business. Hirsch v. Commissioner,315 F.2d at 736; Brannen v. Commissioner,78 T.C. at 501 and n. 7; Hager v. Commissioner,76 T.C. at 784. Such a motive is obviously required for property to be held for the production of income. See Fox v. Commissioner,80 T.C. at 1006; Mitchell v. Commissioner,47 T.C. 120, 128-129 (1966). We have already determined that the petitioners did not engage in their master recording activities with the intention of making a profit. Consequently, we conclude that the petitioners are not entitled *609 to claim investment tax credits with respect to their master recordings. Cf. Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); see Flowers v. Commissioner,80 T.C. at 931 n. 24; Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). [9]
In their brief, the petitioners argue that they should be allowed to deduct their investments in their master recordings under section 165 if they are not allowed to otherwise deduct their losses. The Commissioner argues that the petitioners are precluded from deducting their investments under section 165 because such issue is not properly before the Court and because the petitioners have presented no evidence with respect to the deductibility of their master recording investments under section 165. The petitioners contend that the following language in their petitions suffices to place the issue of the deductibility of their master recording investments under section 165 before the Court: "The losses incurred by petitioners, whether or not in transactions entered into for profit are proper deductions *610 where said losses are pecuniary in nature and capable of measurement." Whether or not the issue of the deductibility of the petitioners' investments under section 165 was properly pleaded in order to be before the Court, the petitioners have presented no evidence to establish the deductibility of their investments under section 165, and accordingly, we hold that the petitioners may not deduct any amount under section 165. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In light of our disposition of this case, it is unnecessary to discuss the other grounds advanced by the Commissioner in support of his disallowance of the petitioners' deductions and tax credits. Decisions will be entered for the respondent.
Footnotes
1. According to the investment memorandum, the term "master recording" refers to the recorded performance embodied on any device from which is then made the mold or permanent manufacturing agent. Phonograph records and tapes are reproduced and manufactured from the mold.↩
2. The record in the present case does not establish exactly what the petitioners acquired when they purchased their master recordings. Mr. Spitz testified that it was his understanding that the petitioners purchased only the master recordings and did not acquire any existing inventory. Mr. Koehl testified that it was his understanding that he purchased a master recording and everything that went with it -- record jackets and promotion. A certain amount of inventory did exist prior to the sale of the master recordings to the petitioners. It is unclear from the record in the present case who owned the pre-existing inventory.
3. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. ↩
4. In this section, the investment memorandum states: "In view of the fact that all of the Master Recordings will be 'used' property, the cost (less estimated salvage value) of such asset will be depreciated by using the 'straight line' method * * *."↩
*. Assumes five (5) year life for tax credit purposes.
5. The petitioners have not claimed that their master recording activity expenses are deductible under sec. 212. ↩
6. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
7. At one point, the investors in the master recordings sold by Rainbow did contemplate some kind of legal action. However, no action was ever initiated by the investors.↩
8. The petitioners have argued that a factor to be weighed in their favor is the fact that their master recording activities involved no elements of personal pleasure or recreation. It is true that sec. 183 was enacted primarily to limit the deductibility of losses incurred in hobbies. Dunn v. Commissioner,70 T.C. 715, 719-720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). It is clear that the losses deducted by the petitioners were not related to a hobby. However, this Court held in Jasionowski v. Commissioner,66 T.C. 312 (1976), that the existence of a hobby is not a prerequisite to the application of sec. 183↩.
9. Jaros v. Commissioner,T.C. Memo. 1985-31; Ziegler v. Commissioner,T.C. Memo. 1984-620↩.